UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HEMLOCK SEMICONDUCTOR
CORPORATION,

                       Plaintiff,                           Case No. 13-cv-11037

v.                                            Honorable Thomas L. Ludington

DEUTSCHE SOLAR GmbH,
f/k/a DEUTSCHE SOLAR AG,

                       Defendant.

_____/

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT,
DENYING MOTION FOR LEAVE TO FILE, DIRECTING SUBMISSION OF
PROPOSED JUDGMENT, AND DIRECTING BRIEFING**

Hemlock Semiconductor and Deutsche Solar's dispute arises from a series of contracts ("Supply Agreements") for the sale of large quantities of industrial-grade polycrystalline silicon from Hemlock to Deutsche Solar. Following changes in global solar market conditions, Deutsche Solar ceased purchasing polycrystalline silicon ("polysilicon" or "poly") under the Supply Agreements, some of which provided for the purchase and sale of polysilicon until 2019. When Deutsche Solar discontinued making further purchases or payments under the Supply Agreements, Hemlock initiated this suit. Hemlock filed its complaint on March 7, 2013.

Hemlock has moved for summary judgment. It contends that Deutsche Solar cannot reasonably contest its liability or damages under the Supply Agreements. Deutsche Solar opposes Hemlock's motion. It argues that the parties modified the Supply Agreements and, alternatively, that it is excused from performing its obligations under the Supply Agreements.

Deutsche Solar also debates (should liability be established) the validity of a liquidated damages provision contained in the Supply Agreements.

Hemlock's motion will be granted. Judgment will be entered against Deutsche Solar.

## I.

Plaintiff Hemlock Semiconductor is a Michigan corporation involved in the manufacture and sale of polycrystalline silicon and photovoltaic solar cells and modules. ECF No. 1 at ¶¶ 2, 3, 7. Hemlock is a wholly-owned subsidiary of the Dow Corning Corporation.

Defendant Deutsche Solar GmbH is a German limited liability company involved in the production of multicrystalline silicon wafers, "which are the building blocks of photovoltaic solar cells and modules." ECF No. 1 at ¶ 8. Deutsche Solar GmbH is a wholly-owned subsidiary of SolarWorld AG.

## A.

Hemlock and Deutsche Solar began their business relationship for the purchase and sale of polycrystalline silicon ("polysilicon" or "poly") around 2005. Originally, Hemlock provided polysilicon to Deutsche Solar at spot-market prices, that is, in discrete shipments requested by Deutsche Solar billed at the prevailing market rate. In the middle of 2005, Deutsche Solar and Hemlock began negotiating a longer-term arrangement for the provision of polysilicon. These discussions concluded with the first Long Term Supply Agreement ("Supply Agreement" or "LTA") between the parties. The parties executed the First Supply Agreement ("First Agreement") on August 30, 2005. First Supply Agreement, Ex. 1, Pl.'s Mot. Summ. J., ECF No. 94. The First Agreement became effective in 2006 and was to remain in effect until 2015. The parties would later execute three more Supply Agreements covering delivery periods into 2019.

All four Supply Agreements contain materially identical terms.[1] Primarily, all four Supply Agreements are "take or pay" contracts. The First, Second, and Third Supply Agreements contain the following provision:

> 5. **Take or Pay Agreement**. This Agreement is a "take or pay agreement" such that Buyer is absolutely and irrevocably required to accept and pay for the contracted volume per year over a 10-year period at the prices set forth in Exhibit B, subject to the adjustments described in Section 4 above. In the event that Buyer fails to order and take delivery of its contracted volume in a given year, HSC shall invoice Buyer for the differential at full contract price and Buyer will pay the same within 30 days of invoice date. Buyer specifically acknowledges and accepts that it will be liable for the full purchase price of volume differential between the quantity ordered and the contracted volume.

First, Second, & Third Supply Agreements, Exs. 1–3, *id.* Similarly, the Fourth Supply Agreement provides:

> 7. **Take or Pay Agreement**. This Agreement is a take or pay agreement such that Buyer is absolutely and irrevocably required to pay the Net Price per kilogram for the Contract Quantity per calendar year over the Term of this Agreement. In the event that Buyer fails to order or take delivery of the Contract Quantity for a calendar year then Seller shall invoice Buyer for the difference between the quantity of Products ordered in that calendar year and the Contract Quantity of Product for that calendar year at the Net Price in effect for HSC DMS for that calendar year (subject to any price adjustment provided for in this Agreement, including without limitation, under Section 8 or Section 18), and Buyer shall pay the same in accordance with Section 10 hereof.

Fourth Supply Agreement, Ex. 4, *id.*

Another important feature of the Supply Agreements is the requirement that Deutsche Solar make large advance payments. That provision, as contained in the First Supply Agreement, provides:

> 2. **Non-Refundable Advance Payment**. Buyer agrees to make a non-refundable, unconditional, irrevocable advance payment in the amount of $36,120,000.00 (the "Advance Payment"). Fifty percent (50%) of the Advance Payment shall be due on or before October 3, 2005 and the remaining fifty percent (50%) of the Advance Payment shall be due on or before October 2, 2006. Notwithstanding

---

[1] The Fourth Supply Agreement varies the most in its wording but still contains the same relevant material provisions as the First, Second, and Third Supply Agreements.

- 3 -

> anything herein to the contrary, Buyer expressly acknowledges its understanding and agrees that, once this Agreement is executed, there are no circumstances or occurrences that will require HSC to refund to Buyer all or any portion of the Advance Payment. The Up-Front Payment shall be applied as a credit against the price of the Products that Buyer is required to purchase under this Agreement at the times and in the amounts shown on **Exhibit B**.

First Supply Agreement, Ex. 1, *id*. The Second and Third Supply Agreements contained identical provisions that varied only with respect to the amount of the Advance Payment. Second & Third Supply Agreements ¶ 2, Exs. 2–3, *id*. The Fourth Supply Agreement contains a materially identical Advance Payment provision—requiring such a payment and crediting it against future purchases under the Agreement. Fourth Supply Agreement ¶ 6, Ex. 4, *id*.

The Agreements also included waiver provisions that restricted conditions under which acceptance of partial payment by Hemlock could be construed as a waiver of its rights under the Agreements. The waiver provision in the First, Second, and Third Supply Agreements read:

> 22. **<u>Waiver</u>**. HSC's failure to exercise a right or remedy or HSC's acceptance of a partial or delinquent payment shall not operate as a waiver of any of HSC's rights or Buyer's obligations under the Agreement and shall not constitute a waiver of HSC's right to declare an immediate or subsequent default.

First, Second, & Third Supply Agreements, Exs. 1–3, *id*. The Fourth Agreement contained an almost identical provision. Fourth Supply Agreement ¶ 26, Ex. 4, *id*.

The Agreements further imposed limitations on any prior or subsequent alterations to the terms of the Agreements. The Integration clause of the Agreements provided:

> 24. **<u>Integration</u>**. The Agreement constitutes the entire understanding between the parties with respect to the subject matter of the Agreement and supersedes any prior discussions, negotiations, memoranda of understanding and the like. Modifications to the Agreement may be made only in writing and signed by each party.

First, Second, & Third Supply Agreements, Exs. 1–3, *id*. Again, the Fourth Agreement contained a materially identical provision. Fourth Supply Agreement ¶ 29, Ex. 4, *id*.

Each Agreement included pricing and quantity schedules that determined the amount of polysilicon that Deutsche Solar would purchase from Hemlock for each year during the life of the Agreements and the price per kilogram of polysilicon for those quantities. For each contract, the gross price charged per kilogram of polysilicon decreased each year over the life of the Agreement. The quantities remained relatively constant each year.[2]

**B.**

For the first few years of the Supply Agreements, Deutsche Solar obtained its polysilicon at prices below what polysilicon commanded on the open market. *See* Woditsch Dep. 77–78, Ex. 5, Pl.'s Mot. Summ. J., ECF No. 99 (explaining that Deutsche Solar secured polysilicon pricing below-market in the Second and Third Agreements); SolarWorld Ann. Grp. Rep. 2007 5, Ex. 11, *id.*, ECF No. 91-12 ("We have banked on a variety of procurement options to back up the expansion plans for our production with an appropriate security of supply of raw materials in the medium- and long-term also beyond the year 2008 thus avoiding dependence on the – currently very high – spot prices in the market."). During this period, according to Hemlock, Deutsche Solar sought quantities in excess of what Hemlock could offer and what was provided for under the Supply Agreements. Homan Dep. 32–33, Ex. 9, *id.*, ECF No. 95-1.

**C.**

By 2009, however, the overall market for solar energy products, particularly solar panels, began to change. Due to the introduction of significant competition from low-cost solar panel producers in China, prices for solar panels in the United States began to drop significantly. *See, e.g.*, Oct. 19, 2011 SolarWorld Press Release, Ex. 14, id., ECF No. 91-15. This had a knock-on effect throughout the solar industry. Demand by solar panel producers for constituent materials,

---

[2] The First and Third Agreements provided for two years of lower quantities—effectively a ramp-up period—before plateauing at the set contract quantity. The Fourth Agreement lasted three years and with a higher quantity provided for in year one and lower quantities provided for in years two and three.

such as polysilicon wafers produced by Deutsche Solar, dropped. Accordingly, demand by polysilicon wafer producers, such as Deutsche Solar, for raw polysilicon underwent a corresponding drop.

Prices for polysilicon in the spot market began falling significantly, eventually passing below the prices in the Supply Agreements. At this point, according to Deutsche Solar, "as the spotprices [sic] break below the [Supply Agreements'] prices, all the [Supply Agreement] contracts are not anymore worth the paper, [sic] they are printed on." Feb. 4, 2010 Butze Email, Ex. 13, *id*., ECF No. 91-14.

### D.

Due to the fall in price for raw polysilicon, Deutsche Solar and Hemlock began discussing potential changes to the Supply Agreements. The purpose of these discussions was to consider whether the price and quantity terms in the Agreements could or should be brought into closer alignment with the prevailing market prices. The first meeting between the parties occurred on October 21, 2011 between the President of Hemlock Andy Tometich, the Vice President of Hemlock James Stutelberg, and SolarWorld AG Chief Executive Officer Frank Asbeck. Oct. 20, 2011 Stutelberg Email, Ex. 18, *id*., ECF No. 95-4. The meeting took place at SolarWorld's facility in Hillsboro, Oregon. *Id*.

The discussions continued into November of 2011 and culminated in an agreement to amend the Supply Agreements. On November 15, 2011, James Stutelberg sent the following email to Frank Asbeck:

> Frank – per our discussion earlier today, please find attached amendment proposals which reflect the changes that we've agreed to thus far:
>
> - Net $28/kg pricing for each of our supply agreements with Deutsche Solar (gross price is different for each depending on the pre-pay amount, as you will see in the attached amendments)

- Timeline for this price is for the remainder of 2011 (starting Nov. 21) and Q1 2012

- We will work out a more permanent / longer term mechanism for a market-based price approach between now and the end of Q1

Hopefully you can continue to see that we value our relationship with Solarworld [sic].

Nov. 15, 2011 Stutelberg Email, Ex. 19, *id.*, ECF No. 91-20.

Mr. Sutelberg's proposals were eventually agreed to and memorialized in amendments to all four Supply Agreements. Both parties signed the Amendments, which were "effective as of November 15, 2011." 4th Am. to First Supply Agreement, Ex. 1, ECF No. 94.[3] The second recital contained in the amendments noted that Deutsche Solar "and HSC desire to amend the Supply Agreement as set forth herein to change the Products and pricing under the Supply Agreement during the remainder of 2011 and during 2012." *Id.* The amendments also contained an integration clause, which provides in relevant part:

> 5. **No Other Effect**. Except as amended in Sections 1, 2, 3, and 4 above, the terms and provisions of the Supply Agreement shall remain in full force and effect and are hereby ratified and confirmed in all respects. . . . This Amendment and the Exhibits attached hereto constitute the entire understanding between the parties with respect to the subject matter of this Amendment and supersede any prior discussions, representations, negotiations, agreements, memoranda of understanding, drafts and the like. This Amendment and the Exhibits attached hereto, and any prior discussions, representations, negotiations, agreements, memoranda of understanding, drafts and the like with respect to the subject matter of this Amendment, shall have no effect and shall constitute no commitment other than as expressly set forth in this Amendment and the Exhibits attached hereto.

*Id.*

Exhibit B to the 2011 Amendments contained the modified quantity and pricing structure that Deutsche Solar and Hemlock agreed upon. Under this structure, there would be no modification to the yearly quantities of polysilicon received by Deutsche Solar. Rather, the

---

[3] The amendment to each Supply Agreement was identical as to the terms of the amendment and varied only with respect to pricing and quantity allotment.

quantities would be redistributed across the calendar year. The original quantities in the Supply Agreements remained in place. The pricing structure was modified for "Late 2011" and "Q1 2012." *Id*. The 2011 Amendments define those periods as "November 21, 2011 through and including December 31, 2011" and "January 1, 2012 through and including March 31, 2012," respectively. *Id*. Exhibit B to the 2011 Amendments provides for a pricing structure during the remainder of 2012 that is consistent with the pricing structure in each Amendment's respective Supply Agreement.

**E.**

During 2012, while the 2011 Amendments were still operative, the parties continued to discuss potential further adjustments to the Supply Agreements.

On March 6, 2012, Deutsche Solar's Chief Financial Officer, Volker Mehlig, and Head of Purchasing, Daniel Menzel, sent a joint letter to Mr. Stutelberg continuing discussions about price adjustments to the Supply Agreements:

> In the above mentioned matter, we may refer to our latest discussions on the pricing of our silicon contracts. As agreed Hemlock and Deutsche Solar will agree starting Q2 to a new price structure based on market price levels.
>
> . . .
>
> In the light of the foregoing, you will surely understand, that the current price level is not acceptable for us. However, we do want to honour our Agreements and are willing to purchase the respective quantity thereunder. However, with regard to the pricing structure, we urgently need to meet in order to find an appropriate solution on fair business terms. Please do not hesitate to provide us at your earliest convenience with suggestions for a convenient time and place for such meeting.

Mar. 6, 2012 Joint Letter to Hemlock, Ex. 21, *id*., ECF No. 95-5 (sic throughout). The letter did not specifically cite a prior agreement that was being invoked by Mr. Mehlig and Mr. Menzel when they indicated that they were proceeding "[a]s agreed." The joint letter elicited the following response from Mr. Stutelberg:

> Contrary to assertions in the Letter regarding an alleged agreement "starting Q2 to a new price structure [under the Supply Agreements] based on market price levels" and "our common understanding to apply a market price level", no such agreement or understanding has been reached. Although Seller currently anticipates that Seller may engage in good faith negotiations with Buyer regarding a potential amendment to the pricing terms of each of the Supply Agreements, (i) Buyer cannot assure that such negotiations will occur and (ii) the foregoing is not intended to, and does not, constitute an agreement to consummate any such amendment. In the meantime, each of the Supply Agreements remains in full force and effect without any form of waiver or modification (including, without limitation, any modification(s) relating to the maximum pricing proposed in the second paragraph of the Letter, to which Seller does not agree).

Apr. 2, 2012 Stutelberg Letter, Ex. 22, *id.*, ECF No. 95-6.

Also at some point during this period of negotiations, Mr. Stutelberg and Mr. Asbeck reopened discussions. After a discussion between the two on March 15, 2012, Mr. Asbeck sent the following note to Mr. Stutelberg:

> In the above mentioned matter, I may refer to our telephone conference dated march 15th 2012, in which we have had the chance to discuss the overall situation of the long-term supply agreements between your company and our 100% subsidiary Deutsche Solar GmbH. First of all, I would like to thank you for the open and constructive discussion and your offer of 23 USD per Kg net or 31 USD per Kg gross. Moreover, I think we made a very good progress towards a continuation of our long lasting good relationship. Accordingly, I would like to summarize our needs based on the actual benchmark spot-market.

> First of all, we need to lower the 2012 volume of silicon to be purchased by 1000 tons. This volume will be delivered and purchased at the end of the contractual period. Moreover, and as already agreed during our November discussions, the price level will be adapted to a competitive market level. For 2012 the same should amount to 26,00 USD per Kg minus the Down Payment (8 USD) bringing us net to the actual price of GCL (18,0 USD per Kg) in order to stay competitive.

> I once more thank you for the fruitful discussions and am looking forward the continuation of our good business relationship.

Asbeck Letter, Ex. 24, Def.'s Resp., ECF No. 106-9 (sic throughout). Mr. Asbeck's letter is undated. There also is no evidence advanced that the letter was responded to directly by Mr. Stutelberg or any Hemlock representative.

- 9 -

**1.**

During the time when discussions were ongoing between the parties, Hemlock was having internal discussions about how to address its long term supply agreements and the fact that they had become unprofitable for many of Hemlock's customers. In late 2011, Hemlock observed that "[w]ith a cost leadership position today, it seems prudent to maintain the option to participate into the future by adjusting to the present situation." 2011 Tometich Presentation 13, Ex. 13, Def.'s Resp., ECF No. 109-2. During the preliminary internal discussions, Hemlock emphasized protecting the Supply Agreements. *Id.* at 28 (slide titled "Protect LTA's [sic]"). Part of this emphasis was maintaining "'business as usual' for 2012 and 2013" and "firmly insist[ing] that each LTA customer honors their contractual agreements[.]" *Id.* To reach that point, however, Hemlock contemplated exactly the types of changes it made via the 2011 Amendments to the Supply Agreements. Hemlock proposed 'reallocating its portfolio' by "lower[ing] price to market levels during a hyper-competitive 2012[.]" *Id.* at 31. It also contemplated "offer[ing] a market-based price for 2012 and beyond[.]" *Id.*

Hemlock's ultimate internal recommendation in 2011 was to "[p]ursu[e] the customer portfolio reallocation approach outlined [above] during Q4 2011." *Id.* at 45. It then explained that it would take the following approach to potentially adjusting its Long Term Supply Agreements:

- Market based price . . .

- Market-based pricing adjustment clauses (likely tied to one or more polysilicon indices)

- Take-or-pay volume obligations with floor pricing to ensure positive cash flows

- Limited timeframe for acceptance of offer to minimize competitive reaction

*Id.* at 47.

This approach was reiterated in an internal memorandum circulated by Hemlock in October 2011. The memorandum also outlined two different approaches that Hemlock was considering adopting for maintaining viability of the Long Term Agreements in 2012. Hemlock's first option was to "[p]rotect the integrity of the LTA's [sic] at all cost [sic]." October 2011 Memo, Ex. 23, Def.'s Resp., 109-7. This involved holding firm to the terms of the Long Term Agreements and only exercising flexibility on limited amendments. Hemlock anticipated that this approach would result in many of their customers refusing to take the contracted quantities. Hemlock noted that Solarworld "already told [Hemlock] . . . that they will refuse to take any of our volumes unless we agree to negotiate." *Id*. Hemlock foresaw this approach "end[ing] up in legal confrontations with many of [its] LTA customers." *Id*.

Hemlock's second possible approach would offer three options to customers. First, customers could adjust some of the pricing in the Long Term Agreements but remain responsible for the full amount of the quantities provided for in the Supply Agreements (the approach eventually used with Deutsche Solar). Second, customers could execute a "partial buy-out" of the Long Term Agreements. Finally, Hemlock wrote, "[i]f neither of the above 2 options are acceptable for the customer, Hemlock enforces and defends the LTA contract(s) using all means available." *Id*.

By early 2012, Hemlock was in the process of implementing a two-step approach to handling the economic position of its long-term supply agreements. Hemlock initiated the two-step approach in late 2011. The first step consisted of the price-adjustment decisions explained above. Hemlock explained Step 1 as follows:

- Amends price to a lower fixed price for end of 2011 and Q1 2012

- No return of prepayments during the period

   . . .

- 11 -

- Changes to cure period and other language to reduce the ability of customers to move purchases into later periods

Feb. 2012 Tometich Presentation 10, Ex. 21, Def.'s Resp., ECF No. 109-5. The summary of Hemlock's approach to Step 1 included the following note: "If no further amendments (i.e. Step 2 are completed, the terms of the original agreements will remain in effect[.]" *Id*. At the point that this two-step approach was being articulated in early 2012, the 2011 Amendments had been concluded and Step 1 had been completed.

As a part of the internal discussions about its long-term agreements in early 2012, Hemlock internally articulated the following approach for the second step:

Key Objectives:

- Retain the benefits of the LTA structure

- Adapt pricing mechanism to market conditions

. . .

Summary of Key Changes:

- Establish price index and mechanism for setting future sales prices under the LTA agreements.

- Make prepayment returns conditional upon sales price exceeding a specific threshold

. . .

- Considering requirements for minimum volumes by quarter and shorter cure periods for customer

- Modify damages provisions to ensure value of LTA is retained

*Id*. at 20. Hemlock further discussed how it would set a market price for polysilicon that it would use to adjust long-term agreements under Step 2. Hemlock explained during its internal discussions that it would look at a number of various metrics to determine a valid market price but that it "[e]xpected to take some time to establish robust and accepted index and

mechanism[.]" *Id*. at 22. Hemlock emphasized the trouble with establishing a proper market index by discussing the likelihood that it would need to extend the timeline for Step 1. *Id*. at 24. Hemlock noted that Step 1 would be extended for the "[p]rimary reason [that it] is . . . not comfortable yet with the index[.]" *Id*.

At this stage (early 2012), Hemlock noted two important elements when discussing its "Next Steps / Path Forward": it would seek to "[i]mplement further adjustment in Solar World" and it was "[l]ikely to delay implementation of 'Step 2' to ensure viability of index and contract mechanism[.]" *Id*. at 28. One month later, still in early 2012, Hemlock further summarized its approach and described Step 2 as being "intended to implement market-based pricing mechanism beginning in Q2 2012." Mar. 2012 Tometich Presentation 8, Ex. 22, Def.'s Resp., ECF No. 109-6. But, Hemlock still cautioned during the internal discussions, "[i]t has become very clear that we will need more time to agree on a mechanism to introduce market-based pricing in our LTA contracts" because "[m]arket-based pricing for LTA's [sic] [is] significantly more complex[.]" *Id*.

## 2.

Following the discussions in early 2012 between Hemlock and Deutsche Solar (and internally at Hemlock) no agreement was reached and negotiations halted.

On August 20, 2012, Deutsche Solar's Head of Corporate Controlling, Peter Genczyk, inquired of Daniel Menzel, Deutsche Solar's Head of Purchasing, if Mr. Menzel "could . . . forward the most recent DS purchase prices for [Deutsche Solar's] long-term silicon contracts[.]" Aug. 20, 2012 Menzel Email, Ex. 24, Pl.'s Mot. Summ. J., ECF No. 95-7. Mr. Menzel

responded: "Hemlock[:] There is no valid contract other than the original LTA [sic: Long Term Agreement] discussions ongoing right now with suppliers." *Id.* (emendations in original).[4]

Indeed, as reflected in Mr. Menzel's email, negotiations between Deutsche Solar and Hemlock about changing the price and quantity structure of the Supply Agreements (which Mr. Menzel acknowledged were still in effect) had recently restarted. The substance of these discussions had shifted from the focus of the late 2011 discussions (that resulted in a change) and early 2012 discussion (which did not). At this point in late 2012, Hemlock included as part of its negotiating position a request for assistance from Deutsche Solar in resolving an international trade dispute between the United States and China over the exchange of solar-industry products (silicon rods and chips, silicon wafers, solar panels, etc.).

The parties scheduled a meeting between Joseph Rinaldi, a Vice President of the Dow Corning Corporation, and Mr. Asbeck for November 20, 2012 to discuss potential solutions to amending the Supply Agreements. *See* Nov. 19, 2012 Rinaldi Email, Ex. 25, Pl.'s Mot. Summ. J., ECF No. 91-26. In advance of that meeting, Mr. Rinaldi sent a proposed letter to Mr. Asbeck via email. The proposed letter was a draft communication that Hemlock sought to have Deutsche Solar (or its parent company SolarWorld) sent to the Undersecretary of Commerce for International Trade. Mr. Rinaldi, in his email, advised: "You have my word that if you sign [the letter] we can have productive discussion tomorrow and I will be prepared [to] offer you a [sic] multistep relief you need, including some immediate relief." *Id.*

Following the meeting between Mr. Rinaldi and Mr. Asbeck, Mr. Rinaldi sent a follow-up communication summarizing the discussion and making an offer to negotiate, provided

---

[4] The email response from Mr. Menzel contains two redacted lines that can only be inferred to be summaries of Deutsche Solar's long-term silicon contracts with other suppliers than Hemlock.

certain conditions occur, including the sending of the proposed letter to the Undersecretary of Commerce.[5] Mr. Rinaldi's email stated that:

> Attached [to the email] is the final vetted version that [Hemlock] would be willing to sign as one last good faith attempt to settle the complex matter amicably. Frank, I know it is short of what you said you are willing to accept, but, I figured I would try before the situation must turn in another direction. . . . I look forward to our continued efforts to resolve this to our mutual satisfaction.

Nov. 23, 2012 Rinaldi Email, Ex. 26, Pl.'s Mot. Summ. J., ECF No. 91-27.

The letter attached to Mr. Rinaldi's email explained that Hemlock and Deutsche Solar were still at an impasse in negotiating further adjustments to the Supply Agreements. It also explained that Hemlock did not believe that it had received adequate assurances from Deutsche Solar that Deutsche Solar will continue to perform under the Supply Agreements. The letter went on, however, to explain that Hemlock was willing to immediately begin negotiating in good faith "to enter into a potential settlement agreement and/or amendments to the Supply Agreements, to include (among other things to be later agreed) price concessions to better account for the changed market conditions and delaying volumes of products to later years, including potential extension of the terms of the Supply Agreements." Nov. 20, 2012 Rinaldi Letter, *id*. Hemlock also "promise[d] that, commencing immediately, it will forebear [sic] and shall not seek to enforce its rights under the Supply Agreements during such good faith negotiations." *Id*. The offer to forbear was also made contingent on Hemlock's belief that Deutsche Solar was negotiating in good faith.

Mr. Rinaldi's November 20, 2012 formal settlement letter also included the following proviso:

---

[5] The parties dispute whether these conditions were, in fact, "conditions precedent" to any further agreement between the parties. That dispute is addressed below and is not resolved or addressed here.

Provided, however, that HSC's above undertaking to negotiate and its above promise to forbear pursuing its rights against Deutsche Solar under the Supply Agreements are subject to, are pre-conditioned on, and shall not be binding on HSC unless and until Deutsche Solar causes its wholly owned subsidiary, SolarWorld Industries America Inc ("SolarWorld")., [sic] to execute (by its President, Gordon Brinser) and deliver to Under Secretary of Commerce for International Trade, Fransisco J. Sanchez, U.S. Department of Commerce, a letter in the form as follows:

> Dear Mr. Undersecretary:
>
> On behalf of SolarWorld Industries America Inc., this letter is to confirm SolarWorld's interest in pursuing good faith negotiations with respect to a potential settlement of the antidumping and countervailing duty investigations involving solar cells and modules from the People's Republic of China (A-570-979 and C-570-980). We hereby request the U.S. Department of Commerce's assistance in initiating settlement negotiations.
>
> Please let us know what information and support we can provide to facilitate this request.

*Id*. The formal letter concluded by advising Deutsche Solar that "this letter is an invitation to negotiate, and it summarizes some, but not all, of the terms of potential settlement." *Id*.

Finally, the letter noted that "[n]o settlement or amendment of the Supply Agreements shall have any force or affect unless and until they are set forth fully in a written agreement and signed by all parties." *Id*. The letter also informed Deutsche Solar that any future settlement or amendment would be contingent on resolving the trade dispute between China and the United States "on terms acceptable to HSC." *Id*. Additionally, Hemlock included a non-waiver provision in the letter stating that "[n]othing in this letter constitutes, and should not be construed to constitute, any waiver by HSC of any of its rights under the Supply Agreements, all of which are expressly reserved." *Id*. The letter was not signed by Mr. Rinaldi, a fact he noted in the November 23, 2012 email that included the formal letter as an attachment.[6]

---

[6] The formal letter dated November 20, 2012 and attached to Mr. Rinaldi's November 23, 2012 email read, in its entirety:

I write on behalf of Hemlock Semiconductor Corporation ("HSC") in connection with Deutsche Solar GmbH's ("Deutsche Solar") four take-or-pay polycrystalline silicon supply agreements with HSC, dated, respectively, as of August 30, 2005, June 10, 2006, June 26, 2007, and October 28, 2009 (as amended, the "Supply Agreements").

As you know, by letter dated November 14, 2012, HSC notified Deutsche Solar that it has failed to provide HSC with requisite adequate assurances that Deutsche Solar will fully perform its obligations under the Supply Agreements through their respective terms. In addition, as set forth in HSC's separate letter to Deutsche Solar, also dated November 14, 2012, although Deutsche Solar has previously requested that HSC amend the Supply Agreements to include price concessions, the parties have not agreed to new pricing or the terms of any amendments. Deutsche Solar remains fully liable to HSC for all amounts, past and future, owing to HSC under the Supply Agreements.

Please be advised that HSC is nevertheless prepared, beginning immediately, to negotiate in good faith to enter into a potential settlement agreement and/or amendments to the Supply Agreements, to include (among other things to be later agreed) price concessions to better account for the changed market conditions and delaying volumes of products to later years, including potential extension of the terms of the Supply Agreements.

In addition, HSC hereby promises that, commencing immediately, it will forebear and shall not seek to enforce its rights under the Supply Agreements during such good faith negotiations; provided that if HSC reasonably determines that Deutsche Solar is no longer negotiating in good faith, HSC will no longer be bound by this promise to forbear and shall be free to pursue all its rights and remedies.

Provided, however, that HSC's above undertaking to negotiate and its above promise to forbear [sic] pursuing its rights against Deutsche Solar under the Supply Agreements are subject to, are pre-conditioned on, and shall not be binding on HSC unless and until Deutsche Solar causes its wholly owned subsidiary, SolarWorld Industries America Inc ("SolarWorld")., [sic] to execute (by its President, Gordon Brinser) and deliver to Under Secretary of Commerce for International Trade, Fransisco J. Sanchez, U.S. Department of Commerce, a letter in the form as follows:

Dear Mr. Undersecretary:

On behalf of SolarWorld Industries America Inc., this letter is to confirm SolarWorld's interest in pursuing good faith negotiations with respect to a potential settlement of the antidumping and countervailing duty investigations involving solar cells and modules from the People's Republic of China (A-570-979 and C-570-980). We hereby request the U.S. Department of Commerce's assistance in initiating settlement negotiations.

Please let us know what information and support we can provide to facilitate this request.

Sincerely,

* * *

As noted, this letter is an invitation to negotiate, and it summarizes some, but not all, of the terms of potential settlement. Any such settlement or amendments shall be contingent on a settlement of the antidumping and countervailing duty investigations references in the letter above on terms acceptable to HSC. No settlement or amendment of the Supply Agreements shall have any force or affect unless and until they are set forth fully in a written agreement and signed by all parties. Nothing in this letter constitutes, and should not be construed to constitute, any waiver by HSC of any of its rights under the Supply Agreements, all of which are expressly reserved.

Nov. 20, 2012 Rinaldi Letter, *id.*

**3.**

Discussion, followed by debate, immediately ensued between representatives of Hemlock and Deutsche Solar concerning whether Deutsche Solar actually signed and executed the proposed letter to the Undersecretary of Commerce and did so in the form requested by Hemlock. Gordon Brinser, President of Deutsche Solar's affiliate SolarWorld Industries America, assured Mr. Rinaldi that the letter had been sent "with only a couple small word changes." Nov. 27, 2012 Rinaldi Email Chain, Ex. 27, Pl.'s Mot. Summ. J., ECF No. 91-28. Mr. Brinser informed Mr. Rinaldi, however, that he has "been asked to not distribute the letter and keep it confidential. Having it get out could create harm." *Id.*

By the next day, November 28, 2012, Mr. Rinaldi had obtained a copy of the letter sent by Mr. Brinser and sent him an email expressing displeasure with the changes made by Deutsche Solar and SolarWorld. According to Mr. Rinaldi, the "slight wording changes are actually quite significant and disappointing." Mar. 5, 2013 Rinaldi Email Chain, Ex. 28, *id.*, ECF No. 91-29.

After the disagreement between the parties over the letter to the Undersecretary for Commerce, discussions on future settlement or amendment broke down.

**F.**

On March 4, 2013, Hemlock reengaged with Deutsche Solar via correspondence from Mr. Rinaldi to Mr. Menzel. Mar. 4, 2013 Rinaldi Letter, Ex. 30, *id.*, ECF No. 99-6. Mr. Rinaldi wrote to inform Deutsche Solar that it "was required pursuant to each of the Supply Agreements to purchase volumes of Products specified therein during 2012. [Deutsche Solar] fell short of this obligation[.]" *Id.* The letter then detailed the amounts by which Deutsche Solar fell short of its purchasing requirements. Under the terms of the Supply Agreements, according to Mr. Rinaldi, if Deutsche Solar "fails to order and take delivery of its contracted volume in a given year,

Hemlock shall invoice [Deutsche Solar] for the differential at the applicable price set forth therein and [Deutsche Solar] will pay the same within 30 days of invoice date." Id. Mr. Rinaldi attached such an invoice to his letter and informed Deutsche Solar that the amount owing was due on April 3, 2013. *Id.*[7]

Without delay, Deutsche Solar responded the next day. It explained its position that "[i]n light of the fact that we have agreed in 2012 to amend the Long Term Supply Agreements with regard to the prices and volumes, Deutsche Solar did not fall short of any purchase obligations." Mar. 5, 2013 Menzel Letter, Ex. 31, *id.*, ECF No. 99-7. Deutsche Solar informed Hemlock that "[a]ccordingly, . . . the Agreements itself [sic] are null and void due to legal reasons." *Id.* The letter cited back to the unsigned formal letter from Mr. Rinaldi dated November 20, 2012 and stated to Hemlock that "you have agreed to forbear and not to seek to enforce any rights under the Long Term Supply Agreements during the negotiations on the terms and conditions of said Agreements moving forward. Accordingly, your request is a clear violation of this undertaking." *Id.*

Two days later, on March 7, 2013, Hemlock filed the instant suit against Deutsche Solar. *See* Compl., ECF No. 1.

On July 17, 2013, after not receiving payment from Deutsche Solar for the funds that it believed it was owed, Hemlock sent Deutsche Solar a notice terminating the contracts. Jul. 17, 2013, Termination Letter, Ex. 32, *id.*, ECF No. 91-33. Hemlock further demanded payment by

---

[7] Mr. Rinaldi also concluded the letter by including non-waiver language and reiterating that Hemlock has not waived or altered any of its rights or remedies under the Supply Agreements:

> No provision hereof waives, releases, modifies, alters, amends or otherwise changes, or shall be deemed a waiver, release, modification, alteration, amendment or change of, any of the rights, remedies or options of Hemlock under the Supply Agreements, nor shall Hemlock be prevented or estopped from exercising or enforcing any of its rights, remedies or options under the Supply Agreements, nor shall Hemlock be limited in its exercise of any other rights, remedies or options in law or equity or under any other agreement or otherwise.

Mar. 4, 2013 Rinaldi Letter, *id.*

Deutsche Solar of all liquidated damages contemplated by the Supply Agreements, which Hemlock alleged totaled $588,272,512.00. *Id*. Hemlock included an invoice for that amount. *Id*. That invoice went unpaid, and Hemlock seeks to recover those damages in the present suit.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must draw all reasonable inferences in favor of the non-movant when reviewing the evidence and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### III.

Hemlock moves for summary judgment on its claim that Deutsche Solar breached the Supply Agreements. Deutsche Solar does not contest the alleged breach but instead argues that the Supply Agreements were either invalid because they were superseded by later agreements or that its performance under the Supply Agreements was excused. Hemlock argues that no valid modifications have been made to invalidate or suspend the Supply Agreements and that Deutsche Solar does not have a valid legal excuse for performance.

Hemlock then seeks summary judgment on its claim for liquidated damages under the Supply Agreements. Deustche Solar asserts that the liquidated damages provisions are unenforceable penalties, and that damages under the Supply Agreements should be calculated according to normal lost-profits analysis.

### A.

Deutsche Solar's first argument is that it and Hemlock reached an oral agreement to modify the Supply Agreements. According to Deutsche Solar, this agreement was first reached in August of 2011 and Hemlock ceased abiding by this agreement in April of 2012. This argument is problematic.

First, as Deutsche Solar concedes, the parties executed a written amendment to each supply agreement in November of 2011. The 2011 Amendment contained an integration clause, the validity of which Deutsche Solar does not challenge. The integration clause in the 2011 Amendment provides:

> This Amendment and the Exhibits attached hereto constitute the entire understanding between the parties with respect to the subject matter of this Amendment and supersede any prior discussions, representations, negotiations, agreements, memoranda of understanding, drafts and the like. This Amendment and the Exhibits attached hereto, and any prior discussions, representations, negotiations, agreements, memoranda of understanding, drafts and the like with

- 21 -

respect to the subject matter of this Amendment shall have no effect and shall constitute no commitment other than as expressly set forth in this Amendment and the Exhibits attached hereto.

4th Am. to First Supply Agreement ¶ 5, Ex. 1, ECF No. 94 (provision identical in all 2011 Amendments). Thus, all discussion about potential amendments to the Supply Agreements that occurred prior to the 2011 Amendment have been fully integrated into the written documents and the written Amendments are the full understanding of the parties up until that point.

Further, Deutsche Solar produces no evidence in support of the allegation that Hemlock ever accepted payment or issued a purchase order inconsistent with the prices stated in the written agreements between the parties. The evidence relied upon by Deutsche Solar is deposition testimony from employees of Deutsche Solar and SolarWorld that merely recites a unilateral belief that the parties had reached an agreement (or an agreement to amend the Supply Agreements) to implement market pricing for the provision of polysilicon. None of these witnesses, however, can identify specific conversations following the 2011 Amendments during which Hemlock agreed to pricing different from any prices reduced to writing in the 2011 Amendments. Additionally, none of the witnesses allege that Hemlock ever accepted payment for polysilicon that was inconsistent with the written requirements of the Supply Agreements or the 2011 Amendment.

**1.**

In any event, Deutsche Solar makes three arguments as to why exceptions to the statute of frauds apply and why an oral modification of the Supply Agreements is in place between the parties. First, Deutsche Solar claims that the statutory exception to the statute of frauds for acceptance of payment applies because Hemlock accepted payment for polysilicon below the prices set forth in the Supply Agreements and the 2011 Amendment. Second, Deutsche Solar claims that Hemlock is equitably estopped from denying further oral amendment to the Supply

Agreements because discussions about market pricing continued after the conclusion of the 2011 Amendment. Third, Deutsche Solar alleges that Hemlock waived the statute of frauds' requirement that any amendment or modification of a contract be in writing. These claims, all meritless, will be addressed in turn.

**a.**

Deutsche Solar first argues that an exception to the statute of frauds for acceptance of payment applies to validate its claim that the parties orally amended the Supply Agreements. The statute of frauds applicable to the Supply Agreements states:

> Except as otherwise provided in this section, a contract for the sale of goods for the price of $1,000.00 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker.

Mich. Comp. Laws § 440.2201(1). The exception upon which Deutsche Solar relies is encoded at Mich. Comp. Laws § 440.2201(3)(c). The exception provides: "A contract that does not satisfy the requirements of [the statute of frauds] but is valid in other respects is enforceable . . . [w]ith respect to goods for which payment has been made and accepted or that have been received and accepted[.]" *Id.* According to Deutsche Solar, Hemlock accepted payment below the prices for polysilicon set forth in the Supply Agreements and the 2011 Amendment. Specifically, Deutsche Solar claims that Hemlock accepted Deutsche Solar's payment of market-based prices for polysilicon and only delivered quantities of polysilicon that were consistent with Deutsche Solar's requirements.

In support of this claim, Deutsche Solar relies on nineteen lines of deposition testimony, from two witnesses, out of more than 1500 pages of evidence produced in support of and in response to summary judgment. Contrary to what Deutsche Solar claims, neither witness states that Hemlock ever accepted payments inconsistent with the written agreements between the

parties. In fact, further examination of the context in which these statements were made only establishes that they are of no evidentiary value to Deutsche Solar's arguments.

> Mr. Asbeck, in his deposition, stated:

> [Hemlock] understood that primarily they would have to support those customers that co-funded their investments, and they are now willing to reduce in addition the prices and postpone deliveries. They were willing to reduce the prices. They wanted to reduce the prices and defer deliveries. In this case that I still remember the price was reduced as a consequence. Of course, this was also confirmed in writing and was then also put into practice by delivering at those agreed prices, and this was August 13th.

Asbeck Dep. 77–78, Ex. 1, Def.'s Resp. Br., ECF No. 106-1. Mr. Asbeck, in this excerpt, is making reference to a specific discussion between himself and representatives of Hemlock. His summary of that discussion only evidences Hemlock's willingness to reduce prices and defer shipments. He in fact agrees that this willingness eventually took the form of a written agreement. Deutsche Solar appears to rely on Mr. Asbeck's invocation of the date August 13 (clarified soon after in the deposition to be of 2011) to be the date at which payment and delivery at adjusted prices and quantities began taking place. But this is incorrect. In the following portion of Mr. Asbeck's deposition he clarifies that he believed that the discussion between him and the Hemlock representatives about making adjustments occurred on August 13, 2011. In any event, Mr. Asbeck eventually acknowledges that he is incorrect about the date and that he is actually recalling a discussion that took place on October 21, 2011 during a meeting between himself and two Hemlock representatives at Deutsche Solar's Hillsboro, Oregon facility.

Not only is it unreasonable to read Mr. Asbeck's invocation of August 13, 2011 as the date at which modified payments and deliveries began, it is disingenuous to ignore the fact that Mr. Asbeck shortly thereafter acknowledged his incorrect recollection of the date on which the subject conversation occurred. Further, Deutsche Solar ignores the fact that Mr. Asbeck explained that the modified payment and delivery schedule was implemented only after the

- 24 -

agreement between Deutsche Solar and Hemlock was reduced to writing. That writing was, of course, the 2011 Amendments.

Thus, even if the discussions Mr. Asbeck references were admissible as proof of an oral agreement—which they are not because of the 2011 Amendments' integration clause—they offer no support to Deutsche Solar's position.

The second deposition excerpt relied upon by Deutsche Solar is from the deposition of Mr. Behrendt:

> Q. . . . do you believe that Hemlock has in any way not lived up to its agreements with your company?
>
> . . .
>
> A. Yes.
>
> [Q]: How so?
>
> A. Yes. If it is true what I heard from the reports of the discussions that happened, then Hemlock agreed market prices, market pricing, which was never implemented. They have reduced prices, yes, but the prices always remained above the market level, prices under contract prices above market prices – price below the contract prices – below.

Behrendt Dep. 99–100, Ex. 5, *id*. Deutsche Solar argues that this testimony establishes that Hemlock accepted payment for polysilicon at below-contract prices. But the testimony does nothing of the sort. It may, at the farthermost reaches of interpretation, support a claim that Hemlock agreed to implement market pricing. Nowhere does Mr. Behrendt claim that Hemlock actually accepted prices below those required by contract or delivered quantities below those required by contract.

Yet, this passage does not even say that. Mr. Behrendt admits that he does not have direct knowledge of the discussions he is relaying. Instead, he qualifies that it is merely "what [he]

heard from the reports of the discussions that happened." *Id*. This evidence does not support Deutsche Solar's position.

### b.

Next, Deutsche Solar argues that Hemlock is equitably estopped from denying that the parties entered into an oral modification of the Supply Agreements. Deutsche Solar does not articulate the elements of equitable estoppel in its argument, but the premise of its argument is that Hemlock continued to negotiate and adjust prices and quantities following the 2011 Amendments. Because of the continued negotiations and adjustments, Hemlock cannot deny that the parties continued to operate under a modified regime after the 2011 Amendments. Implicit in Deutsche Solar's argument is that the parties did not abide by the 2011 Amendments and that, in the period after the Amendments were consummated, the parties kept adjusting prices and quantities to match the market and Deutsche Solar's needs, respectively.

A party may rely on the doctrine of equitable estoppel where "(1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts." *W. Am. Ins. Co. v. Meridian Mut. Ins. Co.*, 583 N.W.2d 548, 550 (Mich. Ct. App. 1998). "[B]ecause the doctrine is intended to ensure fair dealing between the parties, the courts will apply the doctrine only if the party asserting the estoppel . . . has detrimentally relied upon his opponent's prior position." *Lichon v. Am. Universal Ins. Co.*, 459 N.W.2d 288, 292–93 (Mich. 1990) (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982)) (internal quotation marks omitted).

In attempting to assert equitable estoppel, Deutsche Solar relies, once again, almost entirely on the testimony of Dr. Asbeck. But, yet again, Dr. Asbeck's testimony does not support its argument. First, Deutsche Solar relies on the following testimony:

> We agreed on a competitive market level. That is not a specific price and it is a price that is jointly decided upon and a price that's jointly agreed.
>
> . . .
>
> And the reason being that the competitive market level is a moving target, and because it is a moving target, agreeing a price is not a one-off exercise. It requires continuous cooperation.

Asbeck Dep. 107, Ex. 1, Def.'s Resp., ECF No. 106-1. As with prior testimony relied upon by Deutsche Solar, Dr. Asbeck here does not explain how Deutsche Solar in any way detrimentally relied on representations of Hemlock. Dr. Asbeck attests to no change in position by Deutsche Solar as a result of Hemlock's affirmative acts. Dr. Asbeck's testimony reveals only the fact that the parties were discussing the implementation of market pricing across the contracts but that a firm figure could not be reached.

The quoted portion of Dr. Asbeck's testimony actually comes during the discussion of a letter sent on March 6, 2012 by Mr. Stutelberg to another Hemlock employee summarizing a discussion Mr. Stutelberg had with Dr. Asbeck. In discussing the email and the telephone discussion Mr. Stutelberg had with Dr. Asbeck, Dr. Asbeck testified that "[v]arious telephone calls did happen between James Stutelberg and me . . . in order to discuss the planned new business relationship[.]" *Id*. at 98. Dr. Asbeck does not testify that the parties had in fact agreed on a new business relationship. He only explains that in early 2012, the parties were discussing a change in the existing relationship between them. This belies any argument of a firm oral agreement, or that Deutsche Solar was detrimentally relying on an oral agreement between the parties to adjust prices and quantities.

Even Deutsche Solar, in its own brief, concedes that the discussions between the parties on prices and quantities were just that: discussions, not agreements upon which Deutsche Solar detrimentally relied. In addition, each passage cited from Dr. Asbeck's testimony reveals only the fact that the parties were in negotiations, not that Deutsche Solar was actually performing according to a newly agreed upon standard. *See* Asbeck Dep. 102 ("[W]e had cained a new understanding of our business relationship with a flexible approach to prices and volumes, to the *negotiations* about prices and volumes." (emphasis added)); 106–07 ("[Y]ou need to hold *discussions and then everybody can contribute the information that they have and then an agreement is made*, and I contributed the information by indicating the price that were currently being charged . . . by the Chinese." (emphasis added)), Ex. 1, Def.'s Resp., ECF No. 106-1.[8]

None of this evidence establishes detrimental reliance. Deutsche Solar only references reliance once (and not the detrimental variety). Deutsche Solar's claim of reliance rests on testimony of Dr. Asbeck that the parties engaged in discussions about modifying the price in the Supply Agreements and amended "delivery schedules and the quantities and volumes." Asbeck Dep. 84, *id*. Dr. Asbeck then confirms that "this understanding was then implemented in practice." *Id*. at 84–85. And indeed it was. It was implemented in the 2011 Agreements that arose out of the discussions in October 2011 that Dr. Asbeck was referencing. So Deutsche Solar is correct, they did have a right to rely on that agreement and Hemlock's conduct pursuant to it. This is not, however, evidence that Deutsche Solar relied on anything beyond the 2011 Amendments or the Supply Agreement that is not reduced to writing.

---

[8] Another portion of Dr. Asbeck's testimony relied upon by Deutsche Solar comes the closest to alleging an actual binding representation by Hemlock: "In the period that followed both sides engaged in very active correspondence on their own assessments on the real market price that they had promised the new price would reflect. Above that our wish to defer deliveries was granted." Asbeck Dep. 87, *id*. This passage, however, is a part of Dr. Asbeck's discussion of the negotiations between the parties in October 2011 that culminated in the 2011 Amendments. His references to promises and wishes being granted refers to the late 2011 discussions concluding with the 2011 Amendments. These discussions have been integrated into the 2011 Amendments.

**c.**

Last, Deutsche Solar claims that Hemlock waived the statute of frauds requirement that amendments to the Supply Agreements be in writing. The waiver to the exception of the statute of frauds provides:

> (3) The requirements of the statute of frauds section of this article (section 2201) must be satisfied if the contract as modified is within its provisions.
>
> (4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.
>
> (5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

Mich. Comp. Laws § 440.2209 (footnote omitted). Deutsche Solar does not offer any explanation for which of Hemlock's actions constituted "an attempt at modification or rescission." Deutsche Solar only argues that "Hemlock accepted orders at reduced quantities and market-based pricing for nearly eight months." Def.'s Resp. Br. 21, ECF No. 100. But as explained above, *supra* § III.A, modification based on acceptance does not sound in waiver but in the acceptance provisions of the statute of frauds, Mich. Comp. Laws § 440.2201. There is, in any event, no evidence that Hemlock accepted payment at prices other than those set forth in the 2011 Amendments or delivered at quantities other than those in the 2011 Amendments.

Deutsche Solar also argues that it and Hemlock were operating under a "modified business understanding" and that Hemlock retreated from this "understanding" thus imposing an unjust result on Deutsche Solar and constituting waiver. Presumably Deutsche Solar is claiming that this "modified business understanding" is something other than the 2011 Amendments, since otherwise the Amendments would control. Deutsche Solar's evidence of this "understanding", however, is the fact that the parties "were operating under the understanding that their long-term

partnership was worth preserving." Def.'s Resp. Br. 21, ECF No. 100. And there is evidence that both parties valued the business relationship and wanted it to continue, but the very root of this dispute is the fact that they could not agree on the terms under which it would continue. Deutsche Solar does not connect the simple fact that the parties valued their partnership with any conduct or communication by Hemlock to "modify or rescind" the Supply Agreement or the 2011 Amendments.

## 2.

Hemlock argues in the alternative that even if there was some evidence of an oral agreement being reached between the parties, that agreement lacked necessary terms and is thus invalid. This argument need not be addressed because there is no evidence in the record of any oral agreement. As already explained above, even if there were an oral agreement, there is no evidence that such an agreement would be valid in light of the Supply Agreements' provisions requiring that modifications be in writing and signed by both parties.

## B.

Hemlock next addresses Deutsche Solar's affirmative defense that there was a valid standstill agreement between the parties in November 2012 ("2012 Standstill") that stayed the force and effect of the Supply Agreements and the 2011 Amendments. Hemlock makes three arguments that the standstill agreement was never put into effect: first, the standstill agreement was never signed; second, Deutsche Solar did not fulfill a condition precedent to the standstill agreement going into effect; and third, Deutsche Solar did not engage in good faith negotiations under the standstill agreement, leaving Hemlock free to pursue remedies for breach of the Supply Agreements.

**1.**

Hemlock's first argument concerning the validity of the 2012 Standstill is that was unexecuted. That is, despite most of the material terms being agreed to, it was never finalized and signed by the parties. Hemlock provides the relevant document: an unsigned draft letter dated November 20, 2012 attached to an email sent by Mr. Rinaldi or Hemlock to Mr. Brinser and Mr. Asbeck of Deutsche Solar.

The question is whether this unsigned document constitutes an agreement to be bound on the part of Hemlock. Under Michigan law, "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded[.]" Mich. Comp. Laws § 440.2209(2). *See also W. Cent. Packing Inc. v. A. F. Murch Co.*, 311 N.W.2d 404, 410 (Mich. Ct. App. 1981) (applying § 440.2209(2)). As this Court has previously observed:

> The concern over false allegations of oral modification applies equally to all contract provisions, regardless of whether the modification concerns the quantity of goods under the contract, suggesting that compliance is required for all modifications. Therefore, all contracts and contract modifications must be *signed* and in writing if the contract is subject the statute of frauds.

*Woodland Harvesting, Inc. v. Georgia Pac. Corp.*, 693 F. Supp. 2d 732, 738 (E.D. Mich. 2010) (emphasis added). Hemlock's offer to forbear would modify its rights under the Supply Agreements. The Supply Agreements, however, prohibit modification by any means other than a signed writing. No such signed writing in the form of the 2012 Standstill has been produced. Thus, the fact that the 2012 Standstill was unexecuted renders it ineffective.

Even if the Supply Agreements' requirement that modifications be made in writing and be signed by both parties did not apply to the 2012 Standstill (and there is nothing supporting the claim it does not), the 2012 Standstill would still not be effective. "A basic requirement of contract formation is that the parties mutually assent to be bound." *Ayar v. Baymont Inns, Inc.*,

Case No. 245775, 2004 WL 842502, at *2 (Mich. Ct. App. Apr. 20, 2004). To determine if parties have assented to an agreement, Michigan courts "use an objective test, 'looking to the expressed words of the parties and their visible acts.'" *Rowe v. Montgomery Ward & Co.*, 473 N.W.2d 268, 273 (Mich. 1991) (quoting *Goldman v. Century Ins. Co.*, 93 N.W.2d 240 (Mich. 1958)) (emphasis omitted). Michigan has adopted the Restatement approach of manifesting assent whereby "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." *Ayar*, 2004 WL 842502, at *3 (quoting Restatement (Second) of Contracts § 26).

Here, a reasonable person in Deutsche Solar's position would not believe the unsigned letter to be an unequivocal offer since it required the further act of signing the document to bring the 2012 Standstill into effect. Further, the email providing Deutsche Solar the 2012 Standstill clarifies that the 2012 Standstill is not an offer contingent merely on Deutsche Solar's acceptance but also requires Hemlock's signature: "Attached is the final vetted version that we would be willing to sign as one last good faith attempt to settle the complex matter amicably." Nov. 23, 2012 Rinaldi Email, Ex. 26, Pl.'s Mot. Summ. J., ECF No. 91-27.

### 2.

Second, Hemlock argues in the alternative that even if the parties agreed to implement the 2012 Standstill, it did not go into effect because Deutsche Solar did not fulfill a condition precedent. Because the 2012 Standstill was never actually executed this argument is moot. No condition precedent could be fulfilled because there was no executed agreement to turn on the conditions completion.

## C.

Finally, Hemlock seeks summary judgment on Deutsche Solar's affirmative defense that its performance was excused based on commercial impracticability[9] and frustration of purpose. Deutsche Solar claims that China's illegal intervention into the solar market created unforeseeable market distortions that rendered the Supply Agreements commercially impracticable and frustrated the purpose of the Supply Agreements.

Deutsche Solar has combined its discussion of the two theories of excuse. Its use of the two theories depends on the same underlying occurrence: that China illegally intervened in the solar market to such a degree that Deutsche Solar should no longer be required to comply with the Supply Agreements. This Court has already confronted this argument as it relates to both theories of excuse. In *Hemlock Semiconductor Corp. v. Kyocera Corp.*, Case No. 15-CV-11236, 2016 WL 67596 (E.D. Mich. Jan. 6, 2016) this Court dismissed defendant Kyocera Corporation's claims related to Chinese intervention in the global solar market. Kyocera sought a declaratory judgment that China's interference in the solar market made it commercially impracticable to perform its obligations under its own Long Term Supply Agreements with Hemlock and frustrated the purpose of those agreements.

In *Kyocera*, the Court concluded that, as a matter of law, claims that an independent market participant acted in a way that fundamentally changed the market landscape are not cognizable under the theories of commercial impracticability/impossibility and frustration of purpose. That discussion will not be repeated here. This opinion incorporates the reasoning and discussion set forth in *Hemlock Semicondutor Corp. v. Kyocera Corp.*, Case No. 15-CV-11236, 2016 WL 67596 (E.D. Mich. Jan. 6, 2016) as it concerns the claims of China's intervention in

---

[9] Deutsche Solar argues that its performance was rendered commercially impracticable or impossible. The two terms refer to a single theory of excuse of contract performance. For ease of reading, only commercial impracticability will be used to refer to the underlying legal theory.

the solar market. Deutsche Solar does not distinguish the facts or applicable law of *Kyocera* in any way that would affect the outcome of the present motion. Deutsche Solar's affirmative defenses based on China's intervention in the solar market will be dismissed.[10]

### D.

Finally, Hemlock seeks summary judgment on its claim for damages. The Supply Agreements contain a liquidated damages provision. Under that provision, upon breach by Deutsche Solar, all future amounts owed for the supply of polysilicon become immediately due and owing. Deutsche Solar contends that the provision is an unenforceable penalty and that at least some of Hemlock's claim for liquidated damages under the Supply Agreements must be decided by a jury.

Whether a liquidated damages provision is a valid and enforceable agreement for contract damages or an invalid penalty is a question of law. *Moore v. St. Clair Cty.*, 328 N.W.2d 47, 49 (Mich. Ct. App. 1982). "[C]ourts are to sustain such provisions if the amount is 'reasonable with relation to the possible injury suffered' and not 'unconscionable or excessive.'" *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 421 (Mich. Ct. App. 1998) (quoting *Moore*, 328 N.W.2d at 50). "[A] court will award actual damages for a breach and ignore a

---

[10] The parties dispute whether Hemlock has moved for summary judgment on Deutsche Solar's sixteenth affirmative defense. Deutsche Solar claims that Hemlock did not so move because Hemlock mis-interpreted this Court's May 7, 2015 Opinion and Order. Hemlock reads that order as treating Deutsche Solar's sixteenth affirmative defense as derivative of its impossibility/impracticability and frustration of purpose defenses. Deutsche Solar argues that the order only treated affirmative defense fifteen as derivative, not affirmative defense sixteen. Hemlock replies that it seeks summary judgment on all Deutsche Solar's defenses, so the semantic dispute is irrelevant.

The Court's May 7, 2015 Opinion and Order did indeed consider defenses twelve, thirteen, fifteen, and sixteen as a single conceptual group since they all rely on Deutsche Solar's claim that China illegally intervened in the global solar market. See May 7 Op. & Order 23-26. The May 7 Opinion treated the affirmative defenses as a group because both Hemlock and Deutsche Solar did so. Deutsche Solar wrote in its Response Brief in Opposition to Hemlock's Motion to Strike: "As part of its frustration of purpose and impracticability defenses (i.e., affirmative defenses 12, 13, 15, 16), Deutsche Solar contends that the illegal actions of the Chinese government and other state-owned enterprises were not foreseen or foreseeable and provide an excuse to performance." Def.'s Resp. Br. 2–3, ECF No. 53. Deutsche Solar's attempt at semantic gymnastics now is not well taken. Its attempts at changing its position in its current briefs will be ignored.

clause for liquidated damages if the parties' agreement is clearly unjust and unconscionable." *Angelo Iafrate Const. Co. v. Dep't of Transp.*, Case No. 275103, 2007 WL 3088577, at *2 (Mich. Ct. App. Oct. 23, 2007). The Michigan Supreme Court has explained that this is done "only . . . where it is obvious from the contract . . . and the whole subject-matter, that the principle of compensation has been disregarded." *Wilkinson v. Lanterman*, 22 N.W.2d 827, 829–30 (Mich. 1946) (quoting *Jaquith v. Hudson*, 5 Mich. 123, 133 (1858)).

Deutsche Solar argues that the liquidated damages clause is unconscionable because it imposes a requirement to pay $770,759,004 ($585,000,000 exclusive of interest) when Hemlock's lost profits under the contract are $392,000,000 ($447,400,000 before discounting). Generally, such a disparity between a liquidated damages award an actual damages would run the risk of being invalidated as a penalty. But there are two considerations that distinguish this case. First, Deutsche Solar has not produced its own calculation of damages. Second, the Supply Agreements are valid take-or-pay contracts.

## 1.

As to the first point, when contesting a liquidated damages provision, the burden of establishing the unconscionability of the provision lies with the party challenging the provision. *See Travelodge Hotels, Inc. v. Govan*, 155 F. App'x 235, 237 (6th Cir. 2005) (applying Ohio law).[11] Deutsche Solar has not produced evidence of unconscionability. Rather, Deutsche Solar has argued that Hemlock's damages claim contains a number of deficiencies. It also contrasts Hemlock's damages claim with a damages figure arrived at by Maureen Egan, an accountant retained by Hemlock to perform a lost-profits analysis. But nowhere does Deutsche Solar

---

[11] Although the Sixth Circuit in *Travelodge* applied Ohio law, nothing in Michigan law is contrary and the Court adopts the assignment of burden as a reasonable extension of Michigan law. Indeed, many jurisdictions have adopted this assignment of burden. *See, e.g.*, *In re Dow Corning Corp.*, 419 F.3d 543, 550 (6th Cir. 2005) (applying Texas law); *Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC*, No. 07-13523, 2009 WL 3199882, at *15 (E.D. Mich. Sept. 30, 2009) (applying New Jersey law).

produce its own calculation of actual damages or propose an amount of reasonable damages under the contract (it does not explicitly endorse the calculations by Hemlock's non-expert accountant).

Deutsche Solar's lack of evidence about its own calculation of damages strips the Court of a starting point for assessing its claim of unreasonableness. Even accepting Deutsche Solar's adoption of Hemlock's retained accountant, its arguments are incomplete. The lost-profit analysis by Maureen Egan accounted only for Hemlock's cost-savings. It did not take into consideration potential harm to Hemlock as a result of breach that is not directly reflected in the contracts. These costs include capital investments in expanded capacity and loss of good will with customers, suppliers, and employees, amongst other things.

Deutsche Solar argues, without much explanation, that Hemlock's liquidated damages figure ignores cost-savings related to "prepayments it retained, the money it saved by ceasing its capacity expansion, or the costs it saved by not producing poly for Deutsche Solar." Def.'s Resp. Br. 38, ECF No. 100. But these arguments are not so straight forward (further highlighting the need for Deutsche Solar to fully explain its claims). First, the prepayments made by Deutsche Solar are credited against the damage amount. The Supply Agreements are constructed in a manner that credits advance payments by customers against future polysilicon purchases over the life of the agreements. Hemlock's retained accountant, Ms. Egan, noted that the prices used to calculate the contract damages were "net of Advance Payments." Egan Report 5, Ex. 20, Def.'s Resp., ECF No. 109-4.

Second, Deutsche Solar does not explain how Hemlock saved money by ceasing capacity expansion. While it logically follows that Hemlock did not expend additional funds to complete

infrastructure expansion, the expanded production facilities were not brought online, resulting in a loss of prior capital commitments toward expansion.

Finally, while Hemlock undoubtedly saved money by not producing polysilicon for Deutsche Solar, the savings by Hemlock are not readily ascertainable because the Supply Agreements are take-or-pay contracts. This leads to the next important consideration that must be factored into an assessment of the liquidated damages provision and is discussed below, infra § III.D.2.

It may be that Deutsche Solar makes valid points about Hemlock's claim for damages. But the burden is on Deutsche Solar to avoid the operation of a contract provision it knowingly agreed to. In *Vanderbeek v. Barefoot*, 226 F. App'x 209, 213 (3d Cir. 2007), the Third Circuit applied a New Jersey rule that deems liquidated damages clauses between sophisticated entities presumptively reasonable. Michigan law concerning liquidated damages provisions is relatively sparse but the rule adopted in *Vanderbeek* is a sound one. It places the burden of articulating unreasonableness of the provision on the party seeking to evade the provision and takes account of the fact that the provision was the product of arms-length bargaining by competent commercial entities. Deutsche Solar has not furnished evidence sufficient to meet its burden.

**2.**

Second, the fact that the Supply Agreements are take-or-pay changes the calculus of how Hemlock's actual damages are determined. When assessing the reasonableness of the parties' agreement to a liquidated damages clause, courts should primarily examine its reasonableness at the time the contract containing the clause was formed. *Curran v. Williams*, 89 N.W.2d 602, 604 (Mich. 1958). While Deutsche Solar has a reasonable basis for citing Hemlock's cost savings as a result of Deutsche Solar not taking polysilicon, that does not mean that Hemlock's damages for

- 37 -

breach of contract are readily ascertainable. Since the contract is a take-or-pay agreement Deutsche Solar was obligated to pay for all of the polysilicon quantities agreed upon, even if it did not take delivery. Thus, Deutsche Solar could have remained in compliance with the Supply Agreements by paying for the contract quantities but not taking delivery. Under that circumstance, Hemlock would have cost savings for not producing polysilicon for the Supply Agreements, but it would still be entitled to all payments contemplated under the Supply Agreements. The very nature of take-or-pay contracts is that the party furnishing the goods is entitled to payment even if it does not need to produce goods for the delivery period. It is not entirely evident, then, that Hemlock's damages must always be offset by its production cost savings. There exist circumstances under which Hemlock would have been entitled to pure profit under the Supply Agreements because of their take-or-pay aspect.[12]

In light of these two considerations, the liquidated damages provisions of the Supply Agreements are not penal. Deutsche Solar has not carried its burden of demonstrating that the provisions are actually penalties and the fact that the contracts are take-or-pay supports the indeterminacy of damages at the time the Supply Agreements were formed. Hemlock will be awarded the damages it requests.

---

[12] This, of course, raises concerns of efficient breach. Deutsche Solar would likely argue that if a circumstance arose where it could not take polysilicon (as it did here), it would always breach rather than make payments and receive nothing (as it did here). But there are certainly circumstances between a complete inability to take polysilicon and the ability to receive all of the polysilicon required under the contract. It would not be unreasonable for a customer to, for example, pay for polysilicon for a year without taking any deliveries. Perhaps the customer views the Supply Agreement as a long-term net positive and sees a greater benefit to maintaining the agreement in the short term in order to maintain the benefit of the agreement in the long term, even if it means not taking polysilicon during the interim period.

In such a case, Hemlock would be entitled to nearly pure profits from the customer's payments. Hemlock would benefit from some cost-saving associated with lower production levels. But this cost-saving figure would be highly dependent on the contract quantities and Hemlock's storage costs. Hemlock would not, however, benefit from long-term cost-savings under this scenario, i.e. closing or scaling back whole facilities, decreasing workforce, etc.

**IV.**

The final motion that must be addressed is Kyocera Corporation's motion for leave to file a brief as amicus curiae. Hemlock opposes the request.

The conditions under which a party may participate as amicus curiae have been well set forth by the Seventh Circuit Court of Appeals:

> An amicus brief should normally be allowed when a party is not represented competently or is not represented at all, when the amicus has an interest in some other case that may be affected by the decision in the present case (though not enough affected to entitle the amicus to intervene and become a party in the present case), or when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.

*Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997). *See also Dow Chem. Co. v. United States*, Case No. 00-CV-10331-BC, 2002 WL 33012185, at *1 (E.D. Mich. May 24, 2002) (adopting Ryan's standard for permitting amicus participation). The Sixth Circuit has cautioned that "[a]micus curiae may not and, at least traditionally, has never been permitted to rise to the level of a named party/real party in interest nor has an amicus curiae been conferred with the authority of an intervening party of right without complying with the requirements of" the Federal Rules governing intervention. *United States v. State of Mich.*, 940 F.2d 143, 165 (6th Cir. 1991).

Kyocera asserts that "Hemlock's motion for summary judgment in the instant case raises several issues regarding the appropriate measure of contract damages that are directly relevant to the dispute between Hemlock and Kyocera." Mot. File Amicus Br. 7, ECF No. 104. Kyocera thus concedes that it has a direct interest in Hemlock's motion being resolved in a certain way, not in assisting the Court in resolving the issues based on non-pecuniary interests. Kyocera can be fairly characterized as *amicus germaniae solaris* rather than *amicus curiae*. Kyocera seeks

primarily to litigate the merits adverse to Hemlock. Amicus curiae are not permitted in such circumstances. Kyocera's motion will be denied.

### V.

Accordingly, it is **ORDERED** that Hemlock Semiconductor Corporation's Motion for Summary Judgment, ECF No. 91, is **GRANTED**.

It is further **ORDERED** that Kyocera Corporation's Motion for Leave to File, ECF No. 104, is **DENIED**.

It is further **ORDERED** that Plaintiff Hemlock Semiconductor Corporation is **DIRECTED** to submit a proposed judgment listing the amount of accrued damages as of the date of this opinion **on or before July 22, 2016**.

It is further **ORDERED** that Plaintiff Hemlock Semiconductor Corporation is **DIRECTED** to submit a motion for attorney's fees in compliance with the timing rules of Federal Rule of Civil Procedure 54.


Dated: July 13, 2016                                  s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 13, 2016.

s/Julie Owens
JULIE OWENS, Case Manager
Acting in the absence of Michael Sian